# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 21, 2012

## STATE OF TENNESSEE v. ROBERT JASON BURDICK

**Direct Appeal from the Circuit Court for Williamson County**
**No. II-CR053486     James G. Martin, III, Judge**
**Timothy L. Easter, Judge**

---

**No. M2011-01299-CCA-R3-CD - Filed June 13, 2012**

---

A Williamson County jury convicted the Defendant, Robert Jason Burdick, of aggravated rape and especially aggravated kidnapping, and the trial court sentenced him as a violent offender to an effective sentence of twenty-five years in the Tennessee Department of Correction. On appeal, the Defendant contends that: (1) the State failed to prove venue; (2) law enforcement officers' seizure of him violated his constitutional protections; and (3) the evidence is insufficient to sustain his convictions. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Dana M. Ausbrooks, Franklin, Tennessee (on appeal), John Herbison, Nashville, Tennessee, Fletcher Long, Springfield, Tennessee, Edward T. Farmer, Springfield, Tennessee, and Carrie Gasaway, Clarksville, Tennessee (at trial) for the appellant, Robert Jason Burdick.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Kim Helper, District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a series of rapes that occurred in Williamson and Davidson Counties and for which the Defendant was indicted. The cases were severed for trial, and, in this case, the Defendant was tried on charges that he committed the aggravated rape and

especially aggravated kidnapping of the victim, E.M.[1], who was sixteen years old at the time of these crimes.

At the Defendant's trial on these charges, the parties presented the following evidence: E.M. testified that in November 1999 she was living on Foxboro Square West in Brentwood. The State asked her if that was located "here in Williamson County," and E.M. responded "Yes, Ma'am, it is." E.M. recalled that, at that time, she was sixteen-years-old and living with her parents. E.M., a junior at Brentwood High School taking advanced placement classes, was active in the theater department. As such, she was acting as the "student director" of the fall play, for which opening night was scheduled November 2, 1999.

On November 1, 1999, E.M. attended dress rehearsal for the school play, leaving the rehearsal around 10:00 or 10:30 p.m. She went straight home, ate a piece of leftover Halloween candy, and fell asleep while watching television around 11:00 p.m. She awoke at around 1:30 a.m., ate a second candy bar, and then went to bed. Her bedroom was located on the first floor of her parents' townhouse. Her parents were asleep in their room located on the second floor of the townhouse. Later that night, E.M. awoke from a dream to a man, wearing a knit ski mask, pointing a gun to her temple. His right, gloved hand covered her mouth, and he said, "don't say a word, be quiet or I'll kill you." E.M. described the gun against her head as "noticeably cold," and she recalled that it was black. She also recalled that her attacker's eyes were "incredibly blue."

E.M. said her attacker "escorted" her at gunpoint out of her bedroom and through the kitchen, where she saw that the sliding glass door was open. She said that the lock on the door could be "wiggled" open and that she and her parents usually placed a broomstick handle in the sliding door so that it could not be forced open. The broomstick, however, was not placed in the door that night. E.M.'s attacker took her out the sliding glass door, reminding her not to say anything and not to scream. The attacker took her through the back patio and through the wooden gate that separated E.M.'s patio from her neighbor's patio. He took her past some detached garages and into a garage on the end farthest from her home. E.M. recalled that it was cold and raining and that she was cold wearing only panties and a T-shirt.

E.M. recalled that, after they entered the garage, the attacker attempted to cover her eyes with duct tape but, because her hair and face were wet, the tape did not stick. The attacker did, however, successfully cover her mouth with duct tape. The attacker told E.M. to take her clothes off, and she complied, putting her clothes on the ground. The attacker placed a rug on the ground and told her to lay down on the rug. E.M. described herself as

---

[1]In order to protect the victim's privacy, we will refer to the victim by her initials only.

"tense" with her "fists . . . clenched." She said she was pressing her legs together because she knew "the only thing that could possibly come next." The attacker sat down beside E.M., forced his hands between her legs, and fondled her vagina. He then put his fingers inside her. The attacker then "climbed on top" of E.M., forced her legs apart, and forced his penis inside her. He peeled the duct tape away from her mouth and attempted to kiss her.

With the duct tape away from her mouth, E.M. asked the attacker why he was doing this, to which he responded that he had been watching her. She asked him why her, and he responded because she was "beautiful." E.M. said her attacker asked her age, and she told him she was sixteen and would be seventeen in two days. He asked her name, and she gave him her first name. E.M. said she told the attacker that he had to let her go because she had a school play to direct the following night. The attacker asked her if she was using birth control, and she said no. E.M. said she asked the attacker if he was wearing a condom, and he said he wanted her to get pregnant.

E.M. said that she asked the attacker if she could leave. She said he got off of her and stood up. She pled with him, saying "Please, I won't look at you; can I please put my clothes back on and go?" After she asked again, the attacker said, "yes." E.M. said she put her clothes back on, walked passed the attacker, and left, not knowing whether he was going to kill her. E.M. said that as she rounded the outside of the garage, she could not hear the attacker behind her, so she started running out of fear he was going to shoot her in the back. E.M. ran home, entering her yard through her back gate and going into her house through the sliding door. E.M. estimated it took her twenty seconds to get from the garage back to her home. She said she ran upstairs to her parents' bedroom and screamed that she had just been raped.

E.M. said that her mother immediately called 911 and that her father ran downstairs. Shortly thereafter, Brentwood Police Department officers arrived. E.M. gave them the duct tape that had been on her mouth. She said that she was determined to preserve any evidence, including her clothing, that could incriminate her attacker. She did not take a shower or use the restroom in an effort to preserve evidence. E.M. testified that, after speaking with officers, she went to the emergency room at Williamson County Medical Center, where Dr. Kristina McCain examined E.M.

At the emergency room, E.M. gave doctors her clothing, and they performed a rape kit on her. They told her that she would need to return in six months so that they could perform a second HIV test on her. E.M. then changed into new clothing and went to her home where she met with her parents and Detective Tommy Campsey.

E.M. said she felt "disgusting" and wanted to "crawl out of [her] skin." Scared to be

alone, she asked her mother to stay in the bathroom while she showered. E.M. "scrubbed every inch" of herself, including her mouth, in an attempt to "wash [her attacker] off of her skin." E.M. said she stayed home from school that day and attempted to go to school the following day, but "lost it" after the second period of the school day.

E.M. testified that she gave the Brentwood Police Department several interviews in an attempt to identify her attacker. She said, at one point, she mentioned to police that, when she noticed her attacker had blue eyes, she wondered if it was her boyfriend. She said, however, as soon as she returned to her house after the rape, her father called her boyfriend's parents, and her boyfriend was at his house with his parents.

On cross-examination, E.M. said she did not know whether the broom handle was in the sliding glass door on the night of her attack. She agreed that she had previously said that the attacker told her that, "[Y]our dad doesn't know that I'm here." She also said she had described her attacker as being 5'9" tall. E.M. conceded that she had previously told police officers that she suspected her boyfriend was her attacker because he also had blue eyes and because the kisses of her boyfriend and her attacker were similar. Further, she acknowledged she had told officers that the attacker became "mad and frustrated" in a manner similar to her boyfriend. E.M. agreed that the entire attack took between seven and eight minutes. E.M. said she did not see the gun during the rape, and, because she did not hear the gun placed on the ground, she assumed her attacker put the gun in his pocket.

On redirect examination, E.M. testified she told Detective Campsey that her attacker was either 5'9" or 5'10" tall and that she thought he weighed between 170 and 180 pounds.

B.M., the victim's mother, testified that during the early morning hours of November 2, 1999, her daughter entered her room and, sounding panicked, angry, and afraid asked "Where were you while I was being raped?" She said she immediately reached for the phone and dialed 911. E.M. sat, shaking and shivering, on the side of her bed, and B.M. wrapped her in a throw while she was on the phone with the 911 operator. B.M. testified that she did not know if the sliding glass door was locked but that she would assume that it was not. B.M. testified that, after being at the hospital and speaking with people surrounding the investigation, she was "satisfied" that the attacker was not E.M.'s boyfriend.

Officer Bryan Kirkpatrick, with the Brentwood Police Department, testified that he responded to E.M.'s mother's 911 call. When he arrived, E.M., who was with her parents, gave a silver piece of duct tape to him. Officer Kirkpatrick stayed at the house to assist, even after Captain Campsey arrived and began interviewing E.M. Officer Kirkpatrick described E.M. as "obviously shaken" and "upset" but also "very articulate" and "clear," and he said that there was "no confusion in what she was saying." On cross-examination, Officer

-4-

Kirkpatrick conceded that his report indicated that E.M. described her attacker as of "average" build and also that she described him as 5'9" and weighing 140 pounds. On redirect examination, the officer testified that the narrative portion of his report indicated that the victim said that her attacker was between 5'8" and 5'10" in height.

Dr. Kristina McCain, the attending physician who performed the rape kit on E.M., testified that, on November 2, 1999, she treated E.M. She said she obtained samples from E.M., following the protocols dictated by the rape kit. Dr. McCain described E.M. as "agitated" and "a little hyper" and, in the doctor's opinion, E.M. seemed as if she had been traumatized. Dr. McCain testified that, during her examination, she used a fluorescent light to examine E.M.'s body, in an effort to find secretions. The doctor identified some such secretions on E.M.'s labia, and she took a swab of them to be tested. On cross-examination, Dr. McCain testified that she did not see any visible signs of trauma to the victim. She also agreed that the victim's vaginal swab was negative for the presence of sperm.

Lieutenant Richard Hickey, with the Brentwood Police Department, testified that he responded to the 911 call in this case. Lieutenant Hickey was assigned to process the garage where the victim said the rape had occurred. The lieutenant said that the door to the garage was unlocked, and he noted that there was no vehicle in the garage. There were only a few personal items being stored in the garage. Lieutenant Hickey found a blue rug, which he collected because the victim had said the rape occurred on a rug.

Lieutenant Hickey testified that law enforcement investigated hundreds of suspects. Some were excluded because they did not match the physical description. Others were eliminated because they were incarcerated or living out of state at the time the rape occurred. During the investigation, the Defendant's name arose as a suspect.

On cross-examination, Lieutenant Hickey testified that the rug, along with the victim's panties and t-shirt, were sent to the Tennessee Bureau of Investigation ("TBI") crime laboratory for examination. The lieutenant agreed that another suspect, Brandon Holmes, was investigated with regard to this rape. Holmes had committed a similar offense in 1986 and had grown up in the neighborhood where this rape occurred. Police never asked for a DNA sample from Holmes.

On redirect examination, Lieutenant Hickey testified that Holmes lived in Memphis at the Union Mission at the time of the rape. He had no car and no transportation but was employed. Law enforcement officers concluded he could not have left the mission and driven to Brentwood, Tennessee in the middle of the night and then returned to Memphis and reported to work the following day.

Captain Thomas E. Campsey, with the Brentwood Police Department, testified that he was the captain over the criminal investigation division for the police department. As such, he was responsible for supervising all eight detectives employed with the department. He recalled that he was called out to a home in Williamson County that was in Brentwood where he interviewed E.M. During his interview with E.M., she offered him "a lot of detail" in response to his questions, and he described her as "very articulate." As soon as E.M. described what had happened, he accompanied her to the Williamson Medical Center so that they could perform a rape kit. He described how the hospital staff removed E.M.'s clothing while she stood on a sheet in an effort to preserve any evidence that might be on her clothing. The captain said he collected the clothing, noting it was "moist", and put it along with the sheet into a pillow case, which he submitted into the evidence room to be transported to the TBI laboratory the following day. Captain Campsey testified that he gathered the rape kit from the hospital, and he took it to the TBI laboratory.

Captain Campsey testified that investigators continued to follow leads in this case from 1999 until at least 2008. The captain described the investigation, which included a suspect named Brandon Holmes. He said law enforcement concentrated on Holmes but discovered he was homeless and living in a mission in Memphis without access to transportation. The captain was "satisfied" that Holmes did not commit this rape. Captain Campsey testified that, in April 2008, the Defendant's name arose as a suspect in E.M.'s rape. As part of the investigation, officers obtained and executed a search warrant of the Defendant's home.

On cross-examination, the captain testified that E.M. had told him that her attacker's "kisses" were similar to the kisses she had received from her boyfriend. He agreed that E.M., therefore, for a brief period of time, suspected her boyfriend might have been the man who attacked her. The captain agreed that E.M. stated that the attacker exhibited anger and frustration in a manner similar to that of her boyfriend, which added to her suspicion.

Detective Jeff Wiser with the Metropolitan Nashville Police Department testified that he assisted in executing the search warrant on the Defendant's home. Detective Wiser testified about photographs taken during the execution of the search warrant, including photographs of multiple handguns found in the Defendant's home. Police also seized and photographed several items of dark clothing from the Defendant's closet, night-vision goggles, black gloves, and a "mag" light. Detective Wiser said officers found several different condoms inside a semi-automatic gun case and also a black ski mask.

Detective Wiser said on May 1, 2008, he obtained a search warrant to take a buccal swab from the Defendant. The detective sent the swab, which involved Q-tips swabbed on the inside of the Defendant's cheek, to the TBI laboratory for analysis.

The parties stipulated that the TBI laboratory analyzed the buccal swab and determined the Defendant's DNA profile.

Dr. Qadriyyah Debnam, the forensic scientist at the TBI laboratory who analyzed evidence in this case, testified that she did not find any DNA on the area rug submitted by law enforcement. The doctor did, however, find sperm and skin cells on E.M.'s panties, which she processed for DNA in 1999, when they were submitted. In 2008, after law enforcement submitted the oral swab from the Defendant and the TBI created his DNA profile, the doctor compared the Defendant's DNA with the DNA found on the panties. She determined that the DNA profile found on the panties matched the Defendant's DNA sample taken from the oral swab. The doctor testified that the probability of an unrelated individual having the same DNA exceeded the current world population. Dr. Debnam testified that she analyzed the rape kit performed on E.M. at the hospital, and she found the presence of sperm but was unable to create a DNA profile from that sperm.

Based upon this evidence, the jury convicted the Defendant of aggravated rape and especially aggravated kidnapping, and the trial court sentenced him as a violent offender to an effective sentence of twenty-five years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the State failed to prove venue; (2) law enforcement officers' seizure of him violated his constitutional protections; and (3) the evidence is insufficient to sustain his convictions.

## A. Venue

The Defendant first contends that the State failed to establish venue by a preponderance of the evidence. The victim, he contends, said that her house was in Williamson County but that the rape occurred in a garage located some 200 yards from her house. He notes that other witnesses testified that the subdivision was located in Williamson County or that the victim's townhouse was located in Williamson County but none specifically testified that the garage where the rape occurred was located in Williamson County. The State counters that the victim testified that it took her twenty seconds to run from the garage where she was raped to her house and that there was testimony that her house was in Williamson County. The State argues that, the undisputed evidence that the garage was in a different county and the close proximity of the house and the garage, the State met its burden of proving venue.

Proof of venue is necessary to establish the trial court's jurisdiction. *See Harvey v. State*, 376 S.W.2d 497, 498 (Tenn. 1964); *Hopson v. State*, 299 S.W.2d 11, 14 (Tenn. 1957). "Venue is a question for the jury, and can be established by circumstantial evidence." *State v. Young*, 196 S.W.3d 85, 101-02 (Tenn. 2006) (citing *State v. Hamsley*, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984); *State v. Bennett*, 549 S.W.2d 949, 950 (Tenn. 1977)). To determine venue, the jury is permitted to draw reasonable inferences based on the evidence presented. *Id.* at 102 (citing *State v. Johnson*, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984)). The State need only prove by a preponderance of the evidence that the charged offense was committed in the county in which the defendant is being tried. *See* T.C.A. § 39-11-201(e) (2010); *State v. Anderson*, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997); *Bennett*, 549 S.W.2d at 949-50. Slight evidence will be sufficient to carry the State's burden if the evidence is uncontradicted. *State v. Bloodsaw*, 746 S.W.2d 722, 726 (Tenn. Crim. App. 1987).

In support of his argument, the Defendant cites *Franklin v. State*, 64 Tenn. 614 (1875). That case reads, in its entirety:

> Anderson Franklin was indicted in the Circuit Court of Franklin for the murder of Wilborne Franklin. He was tried and convicted of voluntary manslaughter, and sentenced to eight years in the penitentiary.

> The proof, as set forth in the bill of exceptions, is that the homicide was committed about seventy-five yards from Mrs. Franklin's and it is further proved that the prisoner was arrested by an officer of Moore county, at the house of Mrs. Franklin, in Franklin county. This is all the proof in the record as to the venue.

> This proof is insufficient, and the cause must be reversed and remanded.

> In the case of *Maples v. The State*, 3 Heis., the proof was that Dr. Beaty lived in Giles county, and the party poisoned was in a cabin in his yard. The court properly held that the fair construction of that evidence was that the poisoning was in Giles county. In this case no such construction can be given the proof. Mrs. Franklin's is proven to be in Franklin county, and the witnesses locate the place of the homicide at from seventy-five to three hundred yards from Mrs. Franklin's house. Can we infer it was in Franklin county? We might as reasonably infer that a point distant one, two or three miles from the house of Mrs Franklin was in Franklin county.

*Id.* at 614.

We first note that the Defendant's argument is relevant only to his conviction for aggravated rape, as the especially aggravated kidnapping occurred in E.M.'s house, and there was much evidence that the house was in Williamson County. Further, the case cited by the Defendant is distinguishable from the case herein. In *Franklin*, the victim's house was located in Franklin County, but the defendant was arrested by a Moore County officer in Franklin County. The crime occurred in an area close between the two counties. Finally, unlike in *Franklin*, there was testimony that E.M.'s house and the Foxboro Square West subdivision were located in Williamson County. The jury could reasonably infer that the garage was a part of that subdivision and that it too was in Williamson County. We conclude that the State properly proved venue and that the Defendant is not entitled to relief on this issue.

## B. Motion to Suppress

The Defendant next contends that the trial court erred when it denied his motion to suppress evidence found in his house because it was obtained as a result of his being unlawfully stopped by police. The State counters that the trial court correctly denied the motion to suppress because the officer had reasonable suspicion to stop the Defendant.

### 1. Facts From Suppression Hearing

At the hearing on the Defendant's motion to suppress, only one witness testified, Officer Elliott Hamm with the Brentwood Police Department. Officer Hamm testified that during his shift that began on April 27, 2008, and lasted until the morning of April 28, 2008, he was patrolling areas within his jurisdiction. He recalled that it had been raining that day, and, at the beginning of his shift, his shift supervisor reminded him to be on the lookout for "The Wooded Rapist." Officer Hamm recounted that multiple rapes in the area had been perpetrated by a man on rainy nights.

Officer Hamm testified that, at around 12:30 a.m., police received a call about a suspicious person, carrying a flashlight and wearing dark clothing and a dark ski mask, who was looking through windows of vehicles parked in the Meadow Lake Subdivision, which was just south of Brentwood. This area, the officer recalled, was close in location to one of the rapes that had previously been attributed to the man known as "The Wooded Rapist." Five officers responded to this call, and they were looking for the suspect and for his mode of transportation to that area. Officer Hamm said he was specifically looking for "anything out of the ordinary that would normally not be there; cars parked on the side of the road, people walking down the road, [or] footprints in the road."

Officer Hamm said he noticed an unoccupied gray Jeep parked on the side of the road. He got out and felt that the hood of the vehicle was warm, leading him to believe that it had not been there for any substantial amount of time. Officer Hamm looked into the windows of the Jeep and saw a black duffle bag in the rear cargo area, a red baseball hat sitting on a pile of "items," a bottle of water, and an unopened energy drink. Officer Hamm said he noted the license plate number of the Jeep, called the number into dispatch, and then ran the tag through the computer in his patrol vehicle to gain the registration information. The vehicle was registered to the Defendant.

Officer Hamm testified that, after checking the area to see if someone was hiding nearby, he left to assist other officers in unrelated activities and to look for other vehicles that may be suspicious. About an hour later, Officer Hamm was going back to the area where he initially saw the Defendant's Jeep to see if anything had changed. As he was traveling to that area, he saw the Jeep approaching the intersection at Franklin Road. Officer Hamm said he initiated an investigatory traffic stop by activating his blue lights. He said he wanted to identify the driver and determine if he had been related to the call about a man in a ski mask.

Officer Hamm testified that he approached the Defendant, who was driving the Jeep, and told him why the officer had stopped him. Officer Hamm asked the Defendant, who was wearing camouflage pants and a grey t-shirt, for his driver's license. The Defendant told Officer Hamm that he had not noticed any suspicious activity in the area. The officer said he explained to the Defendant that he was going to fill out a "field interview card," and the Defendant voluntarily offered his telephone number. The officer said that the Defendant explained that he had been at the house of a friend, Ricky Douglas, and the officer asked the Defendant if Douglas lived at the corner of Arnold Road and Meadow Lake, where the Jeep had been parked. The Defendant said yes. After speaking with the Defendant for a few minutes, the officer asked the Defendant if he could search the Defendant's car. The Defendant denied the officer permission to search. Officer Hamm informed the Defendant that he was free to leave.

After the Defendant left, Officer Hamm said he and other officers continued to search the area for suspicious activity. Officer Hamm said that, the following day, he and his sergeant went to the house where the Defendant had said he had been visiting a friend and interviewed the owners, who said that there had not been a gathering at their home that evening.

On cross-examination, Officer Hamm testified that he had never had any interaction with the Defendant before that evening, and the Defendant had no apparent previous criminal history. The officer said he could not see the driver when he first stopped the Defendant's Jeep but, after the stop, he quickly noted that the driver was wearing a red baseball cap and

not a black ski mask. Officer Hamm agreed that catching "The Wooded Rapist" was a high priority for his police department, and he opined that it made the department officers "more aware." On further cross-examination, Officer Hamm testified, "[a]ny tags I would have run; if they didn't come back to that neighborhood I would have stopped them."

Based upon this evidence, the trial court denied the Defendant's motion to suppress.

## 2. Analysis

Relative to the issue presented, a trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn.1997).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and " 'article 1, section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (1968)). The analysis of any warrantless search must begin with the proposition that such searches are per se unreasonable under the Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few specifically established and well-delineated exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Tyler*, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). Evidence discovered as a result of a warrantless search or seizure is subject to suppression unless the State establishes that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

An exception to the warrant requirement exists when a police officer conducts an investigatory stop based on a reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Binette*, 33 S.W.3d at 218. Reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity[.]" *Binette*, 33 S.W.3d at 218 (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Reasonable suspicion is determined based upon the totality of the

circumstances of the encounter. *Binette*, 33 S.W.3d at 218 (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). The police may stop a vehicle if they have either probable cause or an "articulable and reasonable suspicion" that the vehicle or its occupants are subject to seizure for violation of the law. *See Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn.1992). An officer's subjective intention for stopping a vehicle is irrelevant, as long as independent grounds exist for the detention. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *State v. Vineyard*, 958 S.W.2d 730, 731 (Tenn. 1997).

When a traffic stop is initiated based on probable cause or reasonable suspicion, a resulting investigation is reviewed under the framework established in *Terry v. Ohio*. *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). Such investigations require that an officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *See State v. England*, 19 S.W.3d 762, 767-68 (Tenn. 2000). Moreover, the officer should employ the least intrusive means reasonably available to investigate his or her suspicions in a short period of time. *Royer*, 460 U.S. at 500. "[T]he proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *State v. Simpson*, 968 S.W.2d 776, 783 (Tenn. 1998) (citation omitted). "If the time, manner or scope of the investigation exceeds the proper parameters," a constitutionally permissible stop may be transformed into an impermissible stop. *State v. Brown*, 294 S.W.3d 553, 562 (Tenn. 2009) (quoting *State v. Childs*, 256 F.3d 559, 564 (7th Cir. 2001), *vacated*, 277 F.3d 947 (7th Cir. 2002)); *State v. Troxell*, 78 S.W.3d 866, 871 (Tenn.2002).

In the context of determining whether investigative methods run afoul of the Fourth Amendment and article 1, section 7, this Court has stated that "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." *State v. Gonzalo Garcia*, No. M2000-01760-CCA-R3-CD, 2002 WL 242358 (Tenn. Crim. App., at Nashville, Feb. 20, 2002) (citing *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)), *rev'd on other grounds*, 123 S.W.3d 335 (Tenn. 2003). A law enforcement officer making a constitutionally permissible traffic stop must not prolong the stop for longer than necessary to process the traffic violation without having a reasonable suspicion of other criminal activity sufficient to warrant prolonging the stop. *State v. Harris*, 280 S.W.3d 832, 842 (Tenn. Crim. App. 2008) (citing *State v. Walker*, 12 S.W.3d 460, 464 (Tenn. 2000)).

We conclude that, under the totality of the circumstances, Officer Hamm had

reasonable suspicion to stop the Defendant's Jeep.  At the time of the stop, "The Wooded Rapist" was at large in the community.  "The Wooded Rapist" had committed his rapes on rainy evenings in the Brentwood area.  On the night of April 27, 2008, which was rainy, Officer Hamm responded to a call about a man wearing a ski mask and dark clothing in the area of Meadow Lake and Arnold Road.  While patrolling that area, looking for something out of place, he noticed a gray Jeep parked on the side of the road.  Upon approaching the vehicle, he found the hood of the vehicle warm.  He ran the vehicle's tags and determined that it was registered to the Defendant, whose listed address was not in the subdivision.  The officer left and returned an hour later, passing the Defendant driving the Jeep away from the Meadow Lake area.  Officer Hamm initiated an investigatory traffic stop to identify the driver of the Jeep and determine if he was related to the call about the man in the ski mask.  We conclude Officer Hamm had an articulable and reasonable suspicion that the vehicle, or its occupant, were subject to seizure for violation of the law.

We further conclude that Officer Hamm's stop of the Defendant did not exceed the proper parameters.  The stop lasted between three and five minutes.  The officer asked the Defendant if he had seen anything suspicious, and the Defendant responded negatively.  The officer filled out a field interview card, and the Defendant offered the officer his phone number.  The officer asked the Defendant why he was in the neighborhood, and the Defendant responded that he was there to visit a friend.

### C. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions. He asserts that the evidence does not support his convictions because E.M.'s testimony about the gun was "vague" and because she did not know what happened to the gun once she and the Defendant were in the garage.  He calls into question the proof that he had a weapon. The State counters that the evidence is sufficient to sustain each of the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)).  This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Direct and circumstantial evidence should be treated the same when weighing the

sufficiency of the evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011) (citing *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)). In *Dorantes*, the Court stated:

> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy beyond a reasonable doubt, we can require no more.

*Id*. at 380-81.

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Aggravated Rape

As relevant to this case, aggravated rape is the unlawful sexual penetration of a victim by the defendant accompanied by force or coercion to accomplish the act, and the defendant is armed with a weapon or any article used or fashioned to lead the victim reasonably to believe it to be a weapon. T.C.A. § 39-13-502 (a)(1) (2010).

The Defendant rests his contention of the sufficiency of the evidence on whether he possessed a gun during the rape, saying that her testimony that he had a weapon was too vague.[2] The evidence, viewed in the light most favorable to the State, proves that the Defendant, wearing a black ski mask, entered E.M.'s home while she was sleeping. He placed a gun to the side of her head and told her not to say a word or he would kill her. He then "escorted" her out of her bedroom and through the sliding glass doors, ultimately to a garage where he told her to lie down on a small area rug. The Defendant proceeded to sexually penetrate the victim. The victim testified that she assumed that the Defendant placed the gun in his pocket during the actual rape, in part because she did not hear him place it on the ground. During a search of the Defendant's home, law enforcement officers found multiple guns, a black ski mask, and condoms inside a gun case. DNA found on the victim's panties matched the Defendant's DNA profile. We conclude that this evidence sufficiently supports the Defendant's conviction for aggravated rape.

### 2. Especially Aggravated Kidnapping

As relevant to this case, especially aggravated kidnapping "is false imprisonment ... [a]ccomplished with a deadly weapon . . . ." T.C.A. § 39-13-305(a)(1), (4) (2010). "A person commits . . . false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a) (2010). "'Deadly weapon' means: (A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury ." T.C.A. § 39-11-106(a)(5) (2010). "'Firearm' means any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." T.C.A. § 39-11-106(a)(11) (2010).

The Defendant again contests the sufficiency of the proof supporting that he possessed a weapon when he falsely imprisoned E.M., contending E.M.'s testimony was too vague.

---

[2]The Defendant makes some mention that there was no proof the victim was injured as required to support his conviction. This conviction was based, however, on his possession of a weapon and not upon any injury to the victim.

E.M. testified that, when the Defendant came into her room on the night of the attack, he placed a black, shiny gun that was eight to ten inches in length next to her head. She said the gun felt cold against her skin. The Defendant led the victim at gunpoint outside the sliding glass doors of her home and into a garage. When police officers searched the Defendant's house, they found multiple guns, including a handgun in a gym bag. This, in combination with the victim's definitive testimony about the gun, is sufficient to prove that the Defendant possessed a deadly weapon when he falsely imprisoned her. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE